UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

North Central Electric Cooperative, Inc.,                          Case No. 3:16-cv-1890

           Plaintiff,

      v.                                                                  MEMORANDUM OPINION
                                                            AND ORDER

Linde, LLC,

           Defendant.

## I.    INTRODUCTION

On June 7, 2018, defendant Linde, LLC, filed its amended Rule 12(b)(6) motion to dismiss the complaint filed by Plaintiff North Central Electric Cooperative, Inc. (Doc. No. 23). North Central filed a brief in opposition to Linde's motion, (Doc. No. 27), and also filed a partial motion for summary judgment. (Doc. No. 28). The parties completed briefing and provided oral argument on both motions on August 22, 2018. For the reasons stated below, North Central's motion is denied and Linde's motion is granted in part and denied in part.

## II.    BACKGROUND

The parties' dispute arises out of a contract for the purchase of electricity. Linde processes and produces gases, primarily for industrial and medical customers. A perhaps-oversimplified overview of this process is that Linde cools air, isolates and extracts the desired chemical as a liquid, and transfers the liquid into a container in order to prepare these gases for transportation and use by

the customer. The process of cooling the air to the temperature necessary to condense the gas into a liquid requires a substantial amount of electricity.

North Central is a not-for-profit electrical cooperative operating in eight counties in north central Ohio. (Doc. No. 1 at 3). Its members are its customers. (Doc. No. 1 at 4). The large majority of these customers are residential and small-commercial users who pay for their electrical usage based upon rate schedules adopted by North Central. (Id.). The remainder are large commercial or industrial customers, like Linde, who frequently negotiate separate agreements for the electricity they intend to use. (Id.).

Until 2013, Linde, along with its predecessor The BOC Group, Inc., operated a gas production facility in Fostoria, Ohio, using electricity provided pursuant to a contract with North Central. The Fostoria plant remained shut down until February 2015, when Linde temporarily restarted the plant in order to manage production during a planned maintenance shutdown of Linde's Pittsburgh, Pennsylvania plant. Prior to restarting the plant, Linde and North Central negotiated an agreement for the purchase and sale of electricity (the "2015 Agreement"). (Doc. No. 1-3). With the Pittsburgh maintenance program completed, Linde shut down the Fostoria plant in May 2015, but was forced to again restart it following an equipment failure at Linde's facility in Delta, Ohio. (Doc. No. 1 at 16-17). The second restart lasted from June until August 2015, and also was covered by the 2015 Agreement. (Doc. No. 1 at 19).

There are several layers involved in the process of taking electricity from the facilities where it is generated and transmitting it to an end-user. Linde purchased electricity from North Central, who purchased electricity and electric transmission services from Buckeye Power, Inc., a not-for-profit electrical cooperative based in Columbus, Ohio. (Doc. No. 1 at 4). North Central is a member of Buckeye, along with the other Ohio electric distribution cooperatives. (Id.). Buckeye owns and operates electric-generation facilities and contracts with third-party transmission providers

2

to deliver electricity from its facilities to end-users. (Doc. No. 1 at 5). Buckeye contracted with American Electric Power ("AEP") to transmit electricity from Buckeye's facilities to Linde's facility in Fostoria, Ohio. (Doc. No. 1 at 5).

PJM Interconnection, LLC is the final layer. PJM is a regional transmission organization which manages the electrical grid across 13 states and the District of Columbia. (Doc. No. 1at 5). Buckeye is a member of PJM and purchases electricity and transmission services through a marketplace overseen by PJM. (Id.).

Under the 2015 Agreement, Linde paid North Central a different rate for electricity depending on whether the Fostoria plant was operated in Production Mode or Standby Mode. (Doc. No. 1-3 at 1). As those phrases and the circumstances imply, Linde's electrical needs were much more substantial in Production Mode than in Standby Mode, and Linde paid different rates for electricity under the two different Modes in order to ensure it had sufficient power to meet its needs while the facility operated in Production Mode.

In large part, the Production Mode rates were calculated by reference to peak electricity usage data. (Doc. No. 1-3 at 14). Buckeye, AEP, and PJM each identified times of peak usage and passed charges derived from those peaks on to North Central. (Doc. No. 1 at 8-9). Buckeye charged monthly based on five peaks during each month, while AEP calculated its charges based on the highest peak during a twelve-month period. (Doc. No. 1at 8). PJM determines its peaks "based upon the top five days with the highest peak hour during the summer months of June through September of the prior year." (Doc. No. 1 at 8).

Based on information it received from these upstream entities as well as its own predictions, North Central provided alerts regarding potential peaks to Linde employees during the time periods Linde operated the Fostoria plant in 2015, to give Linde an opportunity to shut down operations at

3

the plant during time periods which likely would result in the highest rates and usage. (Doc. No. 1 at 18).

The PJM and AEP peaks make up the bulk of the parties' dispute. PJM does not determine its peaks until the beginning of the next calendar year after those peaks occurred, and does not begin to bill customers for usage during those peaks until June of that following calendar year – meaning peaks which occurred between June and August 2015 were not identified until early 2016, and were not billed until June 2016. (Doc. No. 1 at 22). AEP determined its relevant peak in early 2016 and began billing for its charges in February 2016. (Id.). Linde notified North Central on December 21, 2015, that it was terminating the 2015 Agreement effective March 15, 2016. (Id.).

Linde contends this termination ended its obligations to North Central and the other entities, and that it is not responsible for any charges for which invoices were sent following the date of termination. (*See* Doc. No. 23). North Central disagrees, arguing Linde must pay the charges because they arise from Linde's usage of electricity prior to the contracts' termination. (*See* Doc. No. 28).

### III.    STANDARD

A defendant may seek to dismiss a plaintiff's complaint on the ground the complaint fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and accepts as true well-pleaded factual allegations. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 896 (6th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Factual allegations must be sufficient to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Legal conclusions and unwarranted factual inferences are not entitled to a presumption of truth. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering a Rule 12(b)(6) motion, the court may consider the allegations in the complaint as well as any exhibits attached to the complaint, as long as the complaint refers to the

exhibit and the exhibit is central to the claims set forth in the complaint. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV. ANALYSIS

Linde seeks to dismiss each claim set out in North Central's complaint, arguing there are not sufficient facts to support those claims and that they must be dismissed. North Central opposes Linde's motion, and also seeks summary judgment in its favor on its breach of contract claim.

#### A. BREACH OF CONTRACT

Contract interpretation must "give effect to the intent of the parties to the agreement" and "honor the plain meaning of the policy's language 'unless another meaning is clearly apparent from the contents of the policy.'" *Ohio N. Univ. v. Charles Constr. Servs., Inc.*, --- N.E.3d ---, 2018 WL 4926159, at *2 (quoting *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003)). A court must enforce the unambiguous terms of a written contract. *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 714 N.E.2d 898, 901 (Ohio 1999). "[A] contract is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co.*, 797 N.E.2d at 1261 (citing *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 419, 423 (Tex. 2000)).

5

A contract provision is ambiguous if it is subject to two or more reasonable interpretations, *King v. Nationwide Insurance Co.*, 519 N.E.2d 1380, 1383 (Ohio 1988), or if it "is of such doubtful meaning that reasonable minds could disagree as to its meaning." *Beverly v. Parilla*, 848 N.E.2d 881, 886 (Ohio Ct. App. 2006).

Linde argues, in essence, it owes North Central nothing more than it already has paid because the 2015 Agreement does not obligate Linde to pay for any charges which were not billed prior to the effective termination date. (Doc. No. 23 at 9-12). It characterizes the peak demand charges as "post-termination charges" arising from electrical capacity North Central purchased after the contract's termination and not from Linde's usage and that, regardless of when these charges may have arisen, the 2015 Agreement does not contain a survival clause and therefore Linde has no continuing obligation to North Central.

The downfall in Linde's argument, however, is that it recharacterizes North Central's factual allegations. North Central asserts the charges for which it seeks payment from Linde are calculated based upon Linde's usage of electricity during the summer months of 2015 and that both parties knew the charges would be billed no earlier than 2016. (Doc. No. 1 at 9, 13-19). Taking these allegations as true, Linde's obligation to pay the peak demand charges arose when it used the electricity during the summer of 2015, and it cannot avoid its duty to perform that obligation by closing the plant and terminating the contract. *See, e.g., Suter v. Farmers' Fertilizer Co.*, 126 N.E. 304, 306 (Ohio 1919) ("The rule is familiar, based upon unquestioned authority and sound reason, that where the obligations of a contract have attached, and one party, without the consent of the other, does some act or makes some new arrangement which prevents the carrying out of the contract according to its terms, he cannot avail himself of this conduct to avoid his liability to the other party to the contract.")

This does not mean North Central is entitled to prevail on its motion, as what is implicit in my conclusion regarding Linde's motion to dismiss is explicit with regard to North Central's assertions – the 2015 Agreement is ambiguous and that ambiguity can be resolved only by considering evidence extrinsic to the contract itself. *See, e.g., Seringetti Const. Co. v. City of Cincinnati*, 553 N.E.2d 1371, 1375 (Ohio Ct. App. 1988) (ambiguities in contractual provisions are resolved by the finder of fact).

In part, the 2015 Agreement obligated Linde to pay North Central any amounts assessed against North Central "as the Member under Buckeye Member Rate Schedule A-33 and successor rate schedules for purchased electric power and energy" to Linde's plant. (Doc. No. 1-3 at 3). Rate Schedule A-33 required North Central to pay Buckeye the billing demand charges, which were calculated based on measurements recorded at the customer's facility. (Doc. No. 1-3 at 13-14 (for example, PJM billing demand is calculated based on "average of the sums of the Member's actual hourly KW demands measured at the delivery points served"; Buckeye billing demand calculated by reference to usage "measured at the Members' points of delivery").

It is far from clear, however, what exactly the PJM and the Buckeye Billing Demands account for. As I just noted, several provisions of the contract seem to identify charges based upon the customer's electrical usage during the preceding 12 months. As Linde points out, however, some portions of Rate Schedule A-33 allude to capacity, with North Central required to pay Buckeye "charges for all electric power and energy <u>made available</u>" to North Central during a given billing period. (Doc. No. 1-3 at 13) (emphasis added). The Rate Schedule also refers to historical data, including a "Member's Peak of Record Billing Demand in effect as of June 1, 2008," as a potential basis for the PJM Billing Demand calculation. (Doc. No. 1-3 at 13).

Whether the language of the 2015 Agreement is described as "reasonably subject to dual interpretations" or as "of such doubtful meaning that reasonable minds could disagree as to its

7

meaning," the inescapable conclusion is that it is not possible to determine the parties' intent through the language they used in the 2015 Agreement. *Beverly*, 848 N.E.2d at 886; *see also LublinSussman Group LLP v. Lee*, 107 N.E.3d 724 (Ohio Ct. App. 2018). Further, I conclude North Central has not presented sufficient evidence to establish the absence of a genuine dispute of material fact with regard to what the parties meant by the language they used and, at this early procedural stage, I deny North Central's motion without prejudice.

### B. UNJUST ENRICHMENT

Linde contends I must dismiss North Central's unjust-enrichment claim because the parties' relationship is governed by a written agreement and therefore the unjust enrichment doctrine does not apply. (Doc. No. 23 at 17-18). While it is true a plaintiff generally may plead causes of action such as breach-of-contract and unjust enrichment based upon the same facts in the alternative, Linde concedes the allegation that the parties' dispute is in fact covered by the 2015 Agreement. (Doc. No. 30 at 11-12); *see Gallo v. Westfield Nat'l Ins. Co.,* 2009 WL 625522, at *3 (Ohio Ct. App. March 12, 2009) (affirming trial court's dismissal of unjust enrichment claim where "[n]o party" disputed the existence of a contract governing the issues in the case). Because the parties do not dispute the existence of a contract, but only whether that contract was breached, North Central's unjust enrichment claim may not proceed.

### C. FRAUDULENT INDUCEMENT

North Central alleges Linde fraudulently induced North Central to enter into the 2015 Agreement when Linde promised to pay for the electricity it would use but in fact "Linde knew, or acted with such recklessness or utter disregard for the truth that knowledge may be inferred, that it had no intention of actually paying residual demand charges when it persuaded North Central to enter into the 2015 Agreement . . . ." (Doc. No. 1 at 34). Ohio law prohibits a plaintiff from recovering damages for the same conduct under both a breach-of-contract theory and a tort theory

8

such as fraudulent inducement. *See, e.g., Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981). Allegations that, at the time the parties entered into a contract, one party failed to disclose its intent to breach the contract in the future are not sufficient to establish that party "owed a duty separate and distinct for [its] contractual duties," and do not state a plausible claim for fraudulent inducement. *Thornton v. Cangialosi*, No. 2:09-cv-585, 2010 WL 2162905, at *3-4 (S.D. Ohio May 26, 2010). Therefore, I grant Linde's motion to dismiss the fraudulent inducement claim.

### D. DECLARATORY JUDGMENT

Finally, Linde also seeks to have North Central's request for a declaratory judgment dismissed. I deny this request, as claims for declaratory relief are plausible so long as there remains a justiciable controversy between the parties. *Gallo*, 2009 WL 625522, at *4.

## V. CONCLUSION

This case is, at its essence, a contract dispute. For the reasons stated above, North Central's motion for summary judgment, (Doc. No. 28), is denied, and Linde's motion to dismiss, (Doc. No. 23), is granted as to North Central's claims for unjust enrichment and fraudulent inducement, and denied as to North Central's claims for breach of contract and declaratory judgment.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge